IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

S.C. JOHNSON & SON, INC.,

               Plaintiff,

                                              Case No. 16-cv-244-jdp

     v.

MINIGRIP, LLC,

               Defendant.

## MINIGRIP, LLC'S MOTION TO EXCLUDE EXPERT TESTIMONY

Jennifer L. Gregor
Mark W. Hancock
Adam R. Prinsen
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone:  608-257-3911

Nicholas A. Kees
GODFREY & KAHN, S.C.
833 E. Michigan Street, Suite 1800
Milwaukee, WI 53202
Phone:  414-273-3500

Attorneys for Defendant Minigrip, LLC

## **<u>Table of Contents</u>**

Table of Authorities ....................................................................................................... ii

Background ................................................................................................................... 2

Legal Standard ............................................................................................................. 6

Argument ...................................................................................................................... 8

I.     The Opinions of Both SCJ Experts Are Unhelpful to the Extent They Rely on Irrelevant Consumer Perceptions to Interpret a Contract. ................................. 8

II.     Dr. Seggev's Testimony Should Be Excluded As Based on Unreliable Methodology and Insufficient Data. .......................................................... 11

III.     Mr. Wallace's Report Provides Only Bare Narrative and Unsupported Opinion That Exceeds His Expertise, and His Testimony Should Be Barred in its Entirety ............................................................................................. 16

      A.     Mr. Wallace primarily offers a narrative recitation of facts not involving the application of any specialized knowledge ............................ 16

      B.     The lack of support beyond Mr. Wallace's *ipse dixit* renders inadmissible his opinions about similarity, intent, intellectual property, and damages. ...................................................................... 19

      C.     Mr. Wallace is unqualified to opine on intellectual property or product design issues. ................................................................... 27

Conclusion ................................................................................................................. 28

## Table of Authorities

**Cases**

*AHP Subsidiary Holding Co. v. Stuart Hale Co.,*
  1 F.3d 611 (7th Cir. 1993) .................................................................... 13

*Ash Park, LLC v. Alexander & Bishop, Ltd.,*
  2015 WI 65, 363 Wis. 2d 699, 866 N.W.2d 679 .................................... 9

*Baldonado v. Wyeth,*
  No. 04-C-4312, 2012 WL 1802066 (N.D. Ill. May 17, 2012) ........................ 17, 18

*C.W. v. Textron, Inc.,*
  807 F.3d 827 (7th Cir. 2015) .................................................................... 7

*Columbia Propane, L.P. v. Wis. Gas Co.,*
  2003 WI 38, 261 Wis. 2d 70, 661 N.W.2d 776 .................................... 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993).................................................................... 2, 6, 7

*DePaepe v. GMC,*
  141 F.3d 715 (7th Cir. 1998) .................................................................... 24

*GE v. Joiner,*
  522 U.S. 136 (1997).................................................................... 19

*George v. Kraft Foods Global, Inc.,*
  800 F. Supp. 2d 928 (N.D. Ill. 2011).................................................................... 24

*In re Prempro Prods. Liab. Litig.,*
  554 F. Supp. 2d 871 (E.D. Ark. 2008) .................................... 18

*In re Viagra Prods. Liab. Litig.,*
  658 F. Supp. 2d 950 (D. Minn. 2009) .................................... 18

*Klaczak v. Consol. Med. Transp.,*
  458 F. Supp. 2d 622 (N.D. Ill. 2006).................................... 9

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.,*
  735 F.3d 735 (7th Cir. 2013) .................................... 12, 13

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999).................................................................... 8, 28

*Masel v. Mansavage,*
  No. 07-C-454, 2008 WL 5134916 (W.D. Wis. July 2, 2008) .................................... 9

*Myers v. Ill. Cent. R.R. Co.,*
  629 F.3d 639 (7th Cir. 2010) .................................... 7

*RLJCS Enters., Inc. v. Prof'l Ben. Trust Multiple Emp'r Welfare Ben. Plan & Trust,*
  487 F.3d 494 (7th Cir. 2007) .................................... 9

*Spraying Sys. Co. v. Delavan, Inc.,*
  975 F.2d 387 (7th Cir. 1992) .................................... 13

*Stuller v. United States,*
   811 F.3d 890 (7th Cir. 2016) ............................................................................ 28

*Town Bank v. City Real Estate Dev., LLC,*
   2010 WI 134, 330 Wis. 2d 340, 793 N.W.2d 476 .................................................. 9

*Troeger v. Minnesota Life Ins. Co.,*
   No. 14-1083, 2016 WL 6634852 (C.D. Ill. Nov. 9, 2016) ..................................... 7

*United States v. Benson,*
   941 F.2d 598 (7th Cir. 1991) .............................................................................. 17

*United States v. Hall,*
   93 F.3d 1337 (7th Cir. 1996) .............................................................................. 17

*United States v. Johnsted,*
   30 F. Supp. 3d 814 (W.D. Wis. 2013) ................................................................. 7

*United States v. Solis,*
   923 F.2d 548 (7th Cir. 1991) ................................................................................ 8

*United States v. Tamman,*
   782 F.3d 543 (9th Cir. 2015) .............................................................................. 17

*United States v. Vance,*
   No. 07–CR–351, 2011 WL 2633842 (N.D. Ill. July 5, 2011) ............................... 18

*Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.,*
   521 F.3d 790 (7th Cir. 2008) ........................................................................ 19, 26

*WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.,*
   25 F.3d 422 (7th Cir. 1994) .................................................................................. 9

*Wis. Local Gov't Prop. Ins. Fund v. Lexington Ins. Co.,*
   840 F.3d 411 (7th Cir. 2016) .............................................................................. 10

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.,*
   395 F.3d 416 (7th Cir. 2005) .............................................................................. 20

**Rules**

Fed. R. Evid. 702 ..............................................................................................passim

Plaintiff S.C. Johnson & Son, Inc. ("SCJ") owns the Ziploc brand of resealable bags, a product invented more than half a century ago and of which defendant Minigrip, LLC ("Minigrip") was a pioneering influence.  In more recent times, SCJ contracted with Minigrip to manufacture one of the latest iterations of the Ziploc product, the "Project Lincoln" bags, featuring a new innovation:  the "Easy Open Tab." Minigrip agreed not to produce a "similar product" for anyone but SCJ, and not to disclose SCJ's confidential information to any third parties.   SCJ now claims that Minigrip breached these terms by making a competing private-label bag for the Meijer chain of grocery stores.

What constitutes a "similar product" is a key question underlying this lawsuit, and SCJ proposes to show that the Meijer and Project Lincoln bags are "similar" with testimony from two experts.  Dr. Eli Seggev, a former academic and current marketing researcher who has spent his "entire professional career in the field of marketing and consumer behavior," surveyed consumers about their perceptions of similarity among plastic bags—concluding that, out of six options, consumers deemed the Meijer bags "most similar" to Project Lincoln bags.  Expert Report of Eli Seggev, Ph.D. (Dkt. 39) ("Seggev Report") ¶¶ 5, 57.  SCJ's second expert, Robert Wallace, is a marketing professional who intends to testify about brand strategy, product design, and intellectual property issues.  Expert Report of Robert Wallace (Dkt. 16) ("Wallace Report") at 3-4.

The testimony of these experts is inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because it is both unhelpful and unreliable.  Dr. Seggev inexplicably treats *consumers'* perceptions of similarity in *physical appearance* as the metric for assessing what the parties—leaders in the reclosable bag industry—meant by "similar product."  He asks the wrong question of the wrong population:  business contracts are interpreted from the perspective of the industry, not the shopper, and there is no reason to constrain similarity to appearance alone.  His survey is also plagued by methodological flaws that further erode its reliability.  Mr. Wallace, who relies heavily on Dr. Seggev's inadequate and irrelevant survey, offers no specialized knowledge or analysis to support his opinion on issues for which he has no expertise.

Neither opinion should make it past this court's gatekeeping function.  Minigrip therefore moves to exclude the testimony of Dr. Seggev and Mr. Wallace, which fails to meet the threshold requirements of reliability and relevance mandated by *Daubert* and Rule 702.

## BACKGROUND

Dr. Seggev and Mr. Wallace purport to offer expert opinions on issues related to two contracts, a licensing agreement and a manufacturing agreement, between SCJ and

Minigrip.[1]  Both agreements constrain Minigrip from manufacturing or selling the Project Lincoln bags "or a similar product" for or to "anyone other than" SCJ.  The contracts also prohibit Minigrip from disclosing or using any of SCJ's confidential information or intellectual property to or for any third party.  *See* Contract Manufacturing Agreement (Dkt. 41-3) at 5, 13-14 (sections 5.4 and 13.2); Project Lincoln Confidential Disclosure and License Agreement (Dkt. 41-4) at 3 (section 4(c)).

SCJ alleges in this lawsuit that Minigrip breached both provisions by producing the Meijer bags, which SCJ claims are a "similar product" to the Project Lincoln bags and made using SCJ's proprietary information.  *See* Compl. (Dkt. 1) ¶¶ 36-37, 45-46.

### Dr. Seggev's Report

SCJ asked Dr. Seggev "to conduct a study among plastic food bag purchasers to determine the extent to which consumers perceive" the Meijer bags "to be similar in appearance to the" Project Lincoln bags.  Seggev Report ¶ 1.  To accomplish this task, Dr. Seggev ran "an online national survey among a random sample of 600 U.S. plastic food bag purchasers," a population he selected because it "most closely resembles the market that would be affected by the outcome of the litigation that prompted the research."  *Id.* ¶¶ 2, 17.  The survey "screened out people who work for manufacturers or retailers of food products packaging, grocery or food stores, advertising agencies or marketing research firms," as Dr. Seggev sought to exclude anyone "who might have

---

[1] A more detailed factual account appears in Minigrip's concurrently filed motion for summary judgment.

specialized knowledge of the subject matter covered in the survey." *Id.* ¶ 19.  The survey maintained a gender ratio of 80 percent female / 20 percent male respondents, "in line with the shopping by gender statistics used in the industry." *Id.* ¶¶ 18, 42.

Survey respondents were selected from an online market research panel and randomly assigned to one of three product categories—sandwich, storage, or freezer bags. *Id.* ¶¶ 20-27, 32.  When taking the survey, respondents "were presented with pictures of seven food storage plastic bags," which were letter-coded to conceal the brand identities (Glad, Great Value, Meijer, Nice, Roundy's, Up & Up, and Ziploc). *Id.* ¶ 33-34.  Respondents were then asked to choose, "[b]ased on its appearance," which picture "shows a product that is most similar to" the Project Lincoln bag. *Id.* ¶ 52.  They could also answer "none of the above." *Id.* ¶¶ 52-53.  "I don't know" was *not* an option. *Id.* ¶ 52.  According to Dr. Seggev, respondents were shown only the bags, not their packaging, because "the objective of this study was not to determine likelihood of confusion under market conditions but, rather, to use a consumer survey to determine the perceived similarity of the products themselves." *Id.* ¶ 39.  The survey concluded with two open-ended questions—"What makes you think that?" and "Anything else that comes to mind?"—in addition to demographic questions about education and income. *Id.* ¶¶ 54-55.

In each of the three categories, the Meijer bag was "considered by far the most similar to" the Project Lincoln bag, with the percentage of respondents who selected the

Meijer bag "ranging from the low to the high 40s." *Id*. ¶¶ 56-57 & Table 1.  By contrast, the "degree of similarity of all the other bags falls mostly in the low single-digit range with the exception of two Glad bags that score in the low teens." *Id*. ¶ 58.

Summarizing his findings, Dr. Seggev stated that the "physical characteristics that define the appearance of the Meijer bags . . . lead 42% - 49% of consumers to find those bags as most similar to the" Project Lincoln bags. *Id*. ¶ 62.  He relied on these results to conclude "that consumers perceive that the Meijer bags made by Minigrip, based on their appearance, are a product that has a great deal in common with, and a likeness or resemblance to," the Project Lincoln bags. *Id*. ¶ 63.

### Mr. Wallace's Report

SCJ retained Mr. Wallace to testify about "industry custom and practice relating to marketing and brand strategy in the consumer product and private label world." Wallace Report at 3.  Specifically, Mr. Wallace was asked to opine as to "whether Minigrip's actions in this case are consistent with private label brand strategy of matching" their products to a national brand like Ziploc, which private labels "capitalize on" by marketing the alleged similarity. *Id*.  He was also asked to address "Minigrip's evident intent in creating" an allegedly "similar product"; to "deconstruct the industry custom and practices as to why these direct comparison claims are made and how they affect consumer purchasing"; and to "determine if the Ziploc® brand may have been diluted . . . or . . . damaged" by Minigrip's actions." *Id*.  He based his

opinions on his "more than 30 years of experience in marketing, packaging and branding for dozens of consumer product companies," as well as his review of various discovery materials listed in an appendix to his report. *Id.*

The majority of Mr. Wallace's report consists of a "Summary of Relevant Facts," where he reviews the history of the Ziploc brand, SCJ's development of the Project Lincoln bags, and Minigrip's subsequent production of bags for Meijer. *Id.* at 4-12. He then offers his opinion about the "significant similarity" between the Meijer and Project Lincoln bags, *id.* at 12-15, Minigrip's intent to create a similar product, *id.* at 15-16, and the ways in which Minigrip's actions benefited Minigrip and harmed SCJ, *id.* at 16-17.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" if four conditions are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  All four requirements must be satisfied for the expert testimony to be admissible.  *Troeger v. Minnesota Life Ins. Co.*, No. 14-1083, 2016 WL 6634852, at *4 (C.D. Ill. Nov. 9, 2016).

Rule 702 demands that expert testimony assist the trier of fact and rest on a reliable foundation.  *C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015); *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (expert testimony must be both "relevant" and "reliable").  The district court is the "gatekeeper" of expert testimony, ensuring that only testimony that is both helpful and reliable will come before the jury.  *Johnsted*, 30 F. Supp. 3d at 821.  The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10.

Courts apply Rule 702 and *Daubert* using a three-part analysis.  *See Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).  First, the court must determine whether the expert is qualified by knowledge, skill, experience, training or education.  If the expert has the requisite qualifications, then the court needs to decide whether the reasoning or methodology underlying the expert's testimony is "reliable."  Assuming the first two requirements are met, the court then must assess whether the expert's proposed testimony will help the trier of fact in determining a factual issue at hand.  *Id.* District courts have wide latitude in determining how to assess the reliability and

relevance of the expert testimony at issue.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999).

## ARGUMENT

### I.    The Opinions of Both SCJ Experts Are Unhelpful to the Extent They Rely on Irrelevant Consumer Perceptions to Interpret a Contract.

The central question in this lawsuit is one of contract interpretation:  what did Minigrip and SCJ mean when they agreed that Minigrip could not manufacture or sell a "similar product"?  Although business contracts are construed from the perspective of industry insiders, SCJ's experts incomprehensibly mine the opinions of everyday consumers.  Dr. Seggev surveyed "*plastic food bag purchasers* to determine the extent to which *consumers perceive*" Meijer bags to be "similar *in appearance* to" Project Lincoln bags.  Seggev Report ¶ 1 (emphasis added).   This query is flawed from the outset, asking an irrelevant question of an irrelevant population.  This fatal defect taints Dr. Seggev's entire report, which should be rejected because it offers nothing helpful to the trier of fact.  Mr. Wallace compounds the problem by relying exclusively on Dr. Seggev's survey results to support his conclusory assertion that the Meijer bags are "highly similar to" the Project Lincoln bags.  Wallace Report at 15.

Expert testimony is only admissible if the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  "[E]xpert testimony cannot be helpful unless it is relevant."  *United States v. Solis*, 923 F.2d 548, 550 (7th Cir. 1991).  The requirement that "the testimony . . . be

'helpful' . . . dovetails with the relevance requirements of Fed. R. Evid. 401–403." *Masel*

*v. Mansavage*, No. 07-C-454, 2008 WL 5134916, at *1 (W.D. Wis. July 2, 2008).

SCJ advances the testimony of Dr. Seggev and Mr. Wallace to support its claims

that Minigrip breached their contracts.  "Argument about the meaning of . . . contracts .

. . belongs in briefs, not in 'experts' reports.'"  *RLJCS Enters., Inc. v. Prof'l Ben. Trust*

*Multiple Emp'r Welfare Ben. Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007).  Experts can,

however, testify as to "custom and usage," which "is relevant to the interpretation of

ambiguous language in a contract."  *WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25

F.3d 422, 429 (7th Cir. 1994).  While "expert testimony may be allowed when it

addresses [a] custom [or] practice in a particular trade, as it relates to a contract

dispute," an expert "would not be permitted to offer his opinion on how, as a matter of

law, the contract should be construed."  *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d

622, 636–37 (N.D. Ill. 2006) (citing *W.H. Smith Hotel Servs.*, 25 F.3d at 429).

The court's goal in interpreting a contract is to "ascertain the true intentions *of the*

*parties* as expressed by the contractual language."  *Town Bank v. City Real Estate Dev.,*

*LLC*, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 793 N.W.2d 476 (emphasis added) (citation

omitted).  For a business contract, that means construing the language "in the manner in

which it would be understood 'by persons in the business to which the contract

relates.'"  *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶ 37, 363 Wis. 2d 699,

866 N.W.2d 679 (quoting *Columbia Propane, L.P. v. Wis. Gas Co.*, 2003 WI 38, ¶ 12, 261

Wis. 2d 70, 661 N.W.2d 776); *accord Wis. Local Gov't Prop. Ins. Fund v. Lexington Ins. Co.*, 840 F.3d 411, 417 (7th Cir. 2016).  The term "similar product" should therefore be construed from the perspective of professionals in the reclosable plastic bag industry.

But that is not what either of SCJ's experts do.  Dr. Seggev's entire opinion is based exclusively on a survey of consumers, whose perception of similarity among different brands of bags has no bearing of any issues in this lawsuit.  Even if Dr. Seggev's methodologically flawed survey results were accepted at face value, the findings are inconsequential:  what does it matter that consumers chose the Meijer bag more frequently than five others when asked which looked "most similar" to the Project Lincoln bags?

What matters here is the intent of the parties—SCJ and Minigrip—in reaching their agreements.  A business contract among two key players in the resealable bag industry must be construed from the perspective of those within that industry.  Dr. Seggev's survey did the opposite, excluding anyone who works for "manufacturers or retailers of food products packaging, grocery or food stores, advertising agencies or marketing research firms."  Seggev Report ¶ 19.  Those "who might have specialized knowledge" of the industry should have been the target population, but instead they were barred from participating.  *Id.*  The opinion of the participating consumers—who have no background in the resealable bag industry, no knowledge of SCJ and Minigrip's contractual relationship, and no understanding of any relevant product

innovations—is irrelevant and unhelpful to the trier of fact.  As such, Dr. Seggev's

expert report, which does nothing more than explain his survey and the results he

obtained, should be excluded in its entirety.

Mr. Wallace's opinions about the apparent similarity between the Meijer and

Project Lincoln Bags are likewise inadmissible to the extent he relies on Dr. Seggev's

survey to reach his conclusion.   Mr. Wallace concludes that Minigrip's product color,

color band width, and offset lip, and the number of gripper strips, are all "highly

similar" to the Project Lincoln bags—findings he supports by citing Dr. Seggev's

survey, in which "consumers confirmed their perceptions that these products are highly

similar."  Wallace Report at 17-18; *see also id.* at 13-15.  The only other evidence he offers

to support his similarity findings is Minigrip's submission of its Meijer bags to national

equivalency testing comparing the dimensions of Meijer's lip offset to Project Lincoln's

tab.  *See id.* at 14 & nn.45-48.  Mr. Wallace's opinion on similarity merely repackages Dr.

Seggev's findings.  Like Dr. Seggev's report, it should be excluded as unhelpful to the

trier of fact.

## II.   <u>Dr. Seggev's Testimony Should Be Excluded As Based on Unreliable Methodology and Insufficient Data.</u>

Even if Dr. Seggev's survey were not excluded as unhelpful and irrelevant under

Rule 702(a), its serious methodological flaws render it unreliable and therefore

inadmissible under Rule 702(b), (c), and (d).  These three sub-parts to the expert witness

rule collectively demand that an expert "reliably appl[y]" "reliable principles" using

"sufficient facts or data." *See* Fed. R. Evid. 702 (b), (c), and (d).[2]  The consumer survey

does none of these things, because Dr. Seggev has posed the wrong question in an

inadequate format while defying generally accepted survey techniques.

"Consumer surveys conducted by party-hired expert witnesses are prone to

bias."  *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735,

741 (7th Cir. 2013).  As Judge Posner has explained when addressing the use of a survey

in a trademark dispute,

> There is *such* a wide choice of survey designs, none foolproof,
> involving such issues as sample selection and size, presentation of
> the allegedly confusing products to the consumers involved in the
> survey, and phrasing of questions in a way that is intended to elicit
> the surveyor's desired response—confusion or lack thereof—from
> the survey respondents.  Among the problems identified by the
> academic literature are the following: when a consumer is a survey
> respondent, this changes the normal environment in which he or
> she encounters, compares, and reacts to trademarks; a survey that
> produces results contrary to the interest of the party that sponsored
> the survey may be suppressed and thus never become a part of the
> trial record; and the expert witnesses who conduct surveys in aid of
> litigation are likely to be biased in favor of the party that hired and
> is paying them, usually generously.  All too often experts abandon
> objectivity and become advocates for the side that hired them.

---

[2] *Daubert* sets out several "helpful" (but "not definitive") factors that a court may consider in assessing reliability, *Kumho Tire Co.*, 526 U.S. at 151:

> (1) whether the technique can be and has been tested; (2) whether it has been subjected to peer
> review and publication; (3) the known or potential rate of error; (4) the existence and
> maintenance of standards controlling the technique's operations; and (5) "general acceptance"
> within the relevant scientific community.

*Johnsted*, 30 F. Supp. 3d at 817 (citing *Daubert*, 509 U.S. at 593–94).

*Id.* (citations and quotation omitted). Although "shortcomings in . . . survey results" typically "go to the proper weight of the survey and should be evaluated by the trier of fact," there also "will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993); *see also Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) (concluding, based on a survey's "serious problems" and marginal results, that "the borderline value of the outcome reduces to a mere scintilla" and that the survey therefore "does not create a genuine issue of material fact").

Dr. Seggev's survey is already unhelpful under Rule 702(a) because the perceptions of the surveyed population have no bearing on the contractual interpretation question at issue. Its problems are only compounded by the serious methodological issues with the way in which the survey was conducted, which have been flagged in the report of Minigrip's rebuttal expert, Jonathan D. Hibbard—only a few of which are highlighted here.

First, the survey does not measure what Dr. Seggev purports to be measuring. He states, in the opening of his report, that he was asked to determine whether "consumers perceive the [Meijer] bags . . . to be similar in appearance to the" Project Lincoln bags. Seggev Report ¶ 1. In fact, rather than capturing perceptions of plain similarity between the candidate bags, participants were asked to pick the bag that is

"most similar" to the Project Lincoln bag.  Seggev Report ¶ 52.  As Dr. Hibbard

explained, "the survey merely solicits a relative ranking" without assessing "the degree

to which participants perceive the candidate bags as similar to the Project Lincoln

bags."  Expert Report of Jonathan D. Hibbard, Ph.D. (Dkt. 40) ("Hibbard Report")

¶¶ 21-22.  In other words, consumers who perceived the Meijer bag to be dissimilar to

the Project Lincoln bag could still have chosen it as the "most similar" among the

options at hand.

　　　This is more than just a theoretical flaw. The fact that 36.2 percent of participants

selected "None of the above" indicates that those consumers considered none of the

bags to be sufficiently similar to make a choice. *See* Hibbard Report ¶ 23.  Dr. Hibbard

found this percentage to be "astonishingly high" in light of several other design flaws

that encouraged participants to choose a bag even if they deemed none to be

meaningfully similar.  *Id.* ¶ 23.  For example, the primary question was leading (in that

some similarity is assumed), participants were never instructed not to guess, there was

no option to say "I don't know," and the "None of the above" option was less

prominent than the other six.  *Id.* ¶¶ 23, 31-35.  In short, the fact that more than forty

percent of respondents chose the Meijer bag as "most similar" to the Project Lincoln bag

does not tell us whether any of those participants consider the bags to be "similar" in

the first place.

Second, an online survey is an inadequate format to compare the physical design of tangible products like plastic bags.  Participants were unable to perceive the thickness or texture of the bags, the sound and feel of the zipper, the look of the colors, or the presence and size of the lip offset and grip strips.  *See* Hibbard Report ¶ 27. These problems were compounded by the low and inconsistent quality of the photographs and the failure to control for participants' use of small or low-quality display screens.  *Id.* ¶¶ 28-29.  Survey respondents could assess similarity based only on appearance, even though the agreements between SCJ and Minigrip, which refer only to a "similar product," contain no such constraint.

Finally, Dr. Seggev failed to follow several industry standards when conducting surveys like this.  For example:

- The survey did not contain questions that would allow the quality of respondents to be ascertained—for example, asking respondents to state their gender, age, and home zip code would determine if the person responding was the intended panelist, Hibbard Report ¶ 36;

- There were no internal quality control questions, which would impose a "speed bump" to identify respondents who were speeding through the survey—like the 49 participants who completed Dr. Seggev's survey in less than 90 seconds, *id.* ¶ 37;

- Dr. Seggev failed to "clean" his data and allowed several clearly inattentive respondents into the dataset and subsequent analysis, *id.* ¶ 39;

- The sample is improperly weighted toward female shoppers at 80 percent, even though males account for 45 percent of grocery shopping as of 2016, *id.* ¶ 48.

These failings collectively make Dr. Seggev's survey unreliable and inadmissible under Rule 702 and *Daubert*.

### III. Mr. Wallace's Report Provides Only Bare Narrative and Unsupported Opinion That Exceeds His Expertise, and His Testimony Should Be Barred in its Entirety.

#### A. Mr. Wallace primarily offers a narrative recitation of facts not involving the application of any specialized knowledge.

Half of Mr. Wallace's report consists of factual narrative involving no application of specialized knowledge, which falls well outside the scope of proper expert testimony. Mr. Wallace's "Summary of Relevant Facts" begins with SCJ's acquisition of the Ziploc brand in 1997, a fact for which he relies on the Wikipedia entry for Ziploc. *See* Wallace Report at 4 & n.1. He describes SCJ's development of proprietary product features, including its "Easy Open Tab," and its agreements with Minigrip to manufacture Project Lincoln bags with this feature. *See id.* at 5-9. Mr. Wallace then recounts—based on deposition testimony and a few documents—Minigrip's production of resealable bags for Meijer. *See id.* at 9-12.

An expert's opinion "'is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate [his] opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness's expertise) rather than simply an opinion broached by a purported expert.'" *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) (quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)). An opinion that provides "only a recitation of facts and [a] legal conclusion . . . is not a proper expert opinion." *United States v. Tamman*, 782 F.3d 543, 553 (9th Cir. 2015).

The first half of Mr. Wallace's report is nothing more than a recitation of facts involving no application of any specialized knowledge.  In this way, his report suffers from the same defect that prompted two experts' narrative testimony to be ruled inadmissible in *Baldonado v. Wyeth*, No. 04-C-4312, 2012 WL 1802066, at *4 (N.D. Ill. May 17, 2012).  The plaintiff in *Baldonado* sought to have two doctors testify that the defendant's marketing of a hormone therapy, which the plaintiff alleged caused her breast cancer, fell below the standard of care.  The doctors, both of whom the court recognized as highly qualified, offered "lengthy narrative summaries about Defendant's promotion of hormone therapy products over approximately the last 60 years." *Id.*  The court agreed with the defendant that "this type of narrative testimony, based on the experts' review of documents, does not involve any application of scientific, technical or other specialized knowledge and will not aid the jury and will impermissibly interfere with its role as trier of fact." *Id.* (internal quotation marks omitted).  "Under the

circumstances of this case," the court concluded, "allowing an expert to provide summary testimony 'based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself.'"  *Id.* (quoting *United States v. Vance*, No. 07–CR–351, 2011 WL 2633842, at *5 (N.D. Ill. July 5, 2011)); *see also In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 886 (E.D. Ark. 2008) ("If an expert does nothing more than read exhibits, is there really any point in her testifying as an expert?"), aff'd in part and vacated in part, 586 F.3d 547, 571 (8th Cir. 2009) (affirming district court's decision to strike testimony of expert who often "simply read the contents of exhibits").

Mr. Wallace should not be permitted to add the imprimatur of expertise to a bare recitation of facts.  He explains SCJ's concerns about private-label competition by quoting a company document, Wallace Report at 5-6 & nn.8-10; relies on deposition testimony to describe innovations and research in product design, *id.* at 6-7 & nn.11-17; recites the terms of the licensing and manufacturing agreements between Minigrip and SCJ, *id.* at 8-9 & nn.19-28; and recounts the history of Minigrip's production of the Meijer bags, *id.* at 9-12, effectively providing his own "advocacy-based interpretation of" the facts, *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 967 (D. Minn. 2009).  SCJ does not need an expert to tell its story.  Mr. Wallace should be barred from presenting any narrative comparable to what he sets out in his report.

B.      **The lack of support beyond Mr. Wallace's *ipse dixit* renders inadmissible his opinions about similarity, intent, intellectual property, and damages.**

To the extent that Mr. Wallace offers opinions, rather than factual narrative, his conclusions are supported primarily by his own say-so, buttressed by "30+ years of expertise in the branding industry."  Wallace Report at 3.  He conducts no analysis and boasts no specialized knowledge, supplying instead a handful of citations to the record and abundant references to his own expertise.  Mr. Wallace's testimony concerning four subjects—(1) the alleged similarity of the Meijer and Project Lincoln bags, (2) Minigrip's apparent intent in producing the Meijer bags, (3) Minigrip's alleged use of SCJ intellectual property, and (4) any damages to SCJ—should be rejected as unsupported by expert analysis of any kind.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *GE v. Joiner*, 522 U.S. 136, 146 (1997).  The Seventh Circuit has "said over and over that an expert's *ipse dixit* is inadmissible.  'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'"  *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) (citation omitted).  "A witness who invokes 'my expertise' rather than analytic

strategies widely used by specialists is not an expert as Rule 702 defines that term."

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

The frequency with which Mr. Wallace attributes his opinions only to his three decades of experience is remarkable.  For example, in opining on the similarity between the Meijer and Project Lincoln bags, Mr. Wallace explains:

> While there is significant similarity between the individual product components outlined above, the combination of all of these similar attributes makes the Minigrip brand, ***in my expert opinion***, highly similar to the original Ziploc® brand. Again, this conclusion is strongly supported by the Similarity Survey's findings. ***Based on my expertise***, no additional survey would be required to confirm ***my expert opinion*** that the Minigrip product is highly similar to the original Ziploc® brand product.

Wallace Report at 15 (emphasis added).  Other than his own "expertise" (referenced three times in as many sentences), the only authority Mr. Wallace offers for this proposition is Dr. Seggev's survey, which he concludes—based again on his "expertise"—is sufficient on its own.

Similarly, when Mr. Wallace tries to refute Minigrip's assertion that it never used SCJ's proprietary technology, his solitary support is the fact that the Meijer and Project Lincoln bags are manufactured in the same facility:

> Despite Minigrip's claims that they did not use SCJ manufacturing technology in developing their bags, ***it is evident to me*** that Minigrip did, in fact, use and benefit from valuable insights about the manufacturing techniques and processes that they learned through producing Ziploc® bags for the production of the Minigrip bag made for Meijer.  The fact that the Minigrip bag was produced in the same Thailand location as the SCJ bags is, ***in my expert***

> *opinion*, evidence that Minigrip concluded some asset or mix of
> resources was available in Thailand that was preferable to Texas.

Wallace Report at 15 (emphasis added).  He never states why Minigrip's alleged benefit

"is evident to" him.  Furthermore, there is an unbridgeable gulf between the fact of a

shared manufacturing location and his conclusion that Minigrip used SCJ's insights on

the Meijer bags.

Finally, in discussing the "First Mover Advantage" experienced by the first

brand to launch an innovation, Mr. Wallace explains:

> Although Ziploc® was the first product launched with its specific
> features, it is highly probable that Minigrip captured Ziploc®'s
> FMA [First Mover Advantage] by offering a highly similar product
> at a significantly lower price.

Wallace Report at 16.  His key opinion here, that Minigrip likely captured Ziploc's

FMA, is backed by nothing.  He provides support only for the uncontroversial

statement that Meijer bags are sold for less than Project Lincoln bags, which he does by

comparing prices on the 19-count packages of gallon-sized bags.  An expert is not

needed to perform second-grade math.

The absence of any support or analysis renders inadmissible Mr. Wallace's

opinions as to similarity, intent, intellectual property, and damages:

**(1) <u>Similarity</u>**:  Mr. Wallace opines that "[s]ignificant similarities exist between"

the Meijer bags and Project Lincoln bags—in particular the color values used to

differentiate bag sizes, the width of the colored lip, the depth of the "offset lip," the

arrangement and number of "grip strips," and the "count" of bags per package. Wallace Report at 12-13.  He cites only two sources to support these conclusions:  Dr. Seggev's survey and documents from the national equivalency testing to which Minigrip subjected its Meijer bags.

The survey is invalid for the reasons already discussed.  Here, however, Mr. Wallace cites the survey for propositions that go beyond what it even purported to test. For example, he states that "the Similarity Test supports" his conclusion that "the overall visual and *tactile* impression caused by" the grip strips of the Meijer and Project Lincoln bags is "very similar."  Wallace Report at 15 (emphasis added).  The survey results could not offer any insights about "tactile impression," however, because participants were shown only *pictures* of the bags.  Although he observes that the similarity in the bags' grip-strip designs "may be a contributing factor to the survey's findings," he provides no evidence or analysis to support this conclusion.  Indeed, it is unclear whether survey participants could readily see the grip strips in the survey photographs.  *See* Hibbard Report ¶ 27 (noting that the "single, flat perspective of the bags" shown to participants gave them "virtually no opportunity to perceive critical features, including" the number, orientation, and feel of the grip strips).

Meanwhile, Mr. Wallace relies on the equivalency testing to argue that the "offset lip" feature of the Meijer and Project Lincoln bags—whereby "the front of the bag is less tall than the back of the bag," allowing "the consumer to more easily grip

and open the bag"—is similar.  Wallace Report at 14.  However, the numbers cited do not support his assertion that the depth of the offset lip is "highly similar."  Whereas Minigrip's offset for the sandwich size is 0.18 inches, the Project Lincoln offset, at 0.31 inches, is more than 70 percent deeper.  For the gallon size, Project Lincoln's offset is almost 30 percent deeper than Minigrip's (0.464 inches versus 0.36 inches).  Only the quart-sized bags have comparable offsets (0.26 and 0.27 inches).  Most egregiously, Mr. Wallace simply ignores the fact that Project Lincoln bags incorporate an "Easy Open Tab"—SCJ's key innovation—representing an entirely different design than the "lip offset" appearing in the Meijer (and countless other) bags.  *See* Expert Report of Jack Shields (Dkt. 41) ¶ 112.

Mr. Wallace's conclusions about the similarities between the bags are entirely unsupported and therefore inadmissible.

**(2)  <u>Intent</u>**:  Mr. Wallace repeatedly attempts to opine on the intent motivating several of Minigrip's decisions.  For example,

- in describing SCJ's apparent innovation of full-color lips for its bags (Wallace Report at 6), he writes:

> [O]nce retailers like Meijer and Ahold became aware of the new Ziploc® bag, *they immediately recognized* that the new bag contained new innovations and was highly differentiated from current store brand offerings.

- in discussing the appearance of the word "Compare" on the Meijer packaging (Wallace Report at 12), he writes:

> Equating Minigrip's performance to that of Ziploc's® at a lower price point than Ziploc's® is a clear indication of *Minigrip's intention* to create a similar and comparable product to Ziploc®, despite having promised not to do so in the Manufacturing Agreement and License Agreement.

- in explaining the allegedly similar color schemes used by Minigrip and SCJ to differentiate bag sizes (Wallace Report at 13), he writes:

> I conclude that Minigrip used these highly similar colors *intentionally* so as to further equate and/or invite comparisons between the original Ziploc® brand products and Minigrip's highly similar product.

- in summarizing his conclusions (Wallace Report at 18), he writes:

> [I]t was *Minigrip's evident intent* to use SCJ intellectual property and create a similar product to the Ziploc® brand.

None of this is proper matter for expert opinion. An expert cannot testify that a defendant "had a particular motive." *DePaepe v. GMC*, 141 F.3d 715, 720 (7th Cir. 1998) (observing that an engineer could opine that a design decision by GM "saved a particular amount of money," and that GM's "explanation for the decision was not sound (from which the jury might infer that money was the real reason)," but could not testify "that GM had a particular motive"); *see also George v. Kraft Foods Global, Inc.*, 800 F. Supp. 2d 928, 932–33 (N.D. Ill. 2011) (excluding expert's state of mind opinion as speculative and unhelpful). Mr. Wallace has no idea what motivated any of Minigrip's decisions or how Minigrip perceived developments by SCJ, and his speculation on such subjects is improper.

**(3)  Intellectual property**:  Mr. Wallace repeatedly offers unfounded conclusions about the existence and misappropriation of SCJ's intellectual property.  He states, citing only the deposition of a Minigrip employee, his "understanding" that certain colors from the Project Lincoln bags "were distinctive and proprietary to the Ziploc® brand," meaning "that no other competitive national or private label brand of bags" had used them.  Wallace Report at 6.  Later, without citing any authority, he articulates his "understanding" a certain "unique combination of product innovations"—including the Easy Open Tab—"had never been produced before and was proprietary to the Ziploc® brand at the time of its launch."  *Id.*  Even if these statements are true or uncontroversial, his "understanding" is not enough to support them.

More problematically, Mr. Wallace advances several groundless conclusions about  Minigrip's alleged reliance on SCJ intellectual property.  He claims, based only on a handful of documents and "the product characteristics Minigrip chose to create in its Meijer bags," that "Minigrip used and leveraged SCJ research and manufacturing technology intellectual property."  *Id.* at 15.  He then asserts, in "my expert opinion," that Minigrip was only able to develop the Meijer bag as quickly as it did by "leveraging SCJ intellectual property on the production of and brand messaging of its highly similar brand."  *Id.* at 16.  Similar assertions reappear in the summary of conclusions:

> 9.    Minigrip used SCJ intellectual property in developing its
>       product and creating its brand messaging;

25

> 10. it was Minigrip's evident intent to use SCJ intellectual property and create a similar product to the Ziploc® brand;
>
> 11. Minigrip greatly benefitted by speed to market efficiencies and First Mover Advantages by using SCJ intellectual property and creating a similar product to the Ziploc® brand.

*Id.* at 18.

These conclusions go to the heart of SCJ's claim that Minigrip breached the contracts by using SCJ's proprietary information on behalf of Meijer.   Yet Mr. Wallace opines on this ultimate question based only his personal understanding and alleged expertise.  Supplying "nothing but a bottom line supplies nothing of value to the judicial process."  *Wendler & Ezra, P.C.*, 521 F.3d at 791.  Mr. Wallace's *ipse dixit* on intellectual property issues is inadmissible.  *Id.*

**(4) <u>Damages</u>**:  SCJ has been clear, in its complaint and subsequent submissions, that it is not seeking damages in this case.  *See* Minigrip's Motion to Strike Jury Demand (filed concurrently herewith).  Nevertheless, Mr. Wallace opines, again in "my expert opinion," that:

> the Ziploc® brand could have been significantly damaged by the Minigrip brand launch.  Because Minigrip is so similar to Ziploc® and was launched so soon after Ziploc®, I believe that the Ziploc® brand's good will, associative value and positive consumer's associations were eroded by Minigrip.

Wallace Report at 17.  The only "proof" he cites for this proposition is a 1988 article in the Strategic Management Journal, which states that first-mover advantage is easily eroded by new brands using the same technology.  Putting aside the fact that damages

are not being sought here and are therefore irrelevant, a single article—with no analysis to link its findings to the facts of this case—is not enough to support the proffered conclusion.  Mr. Wallace's opinions as to damage, resting on nothing but *ipse dixit*, are unreliable and unhelpful and should be excluded.

### C.    Mr. Wallace is unqualified to opine on intellectual property or product design issues.

Minigrip does not question Mr. Wallace's qualifications and expertise in the arena of marketing and branding.  But the central issues in this case are not about marketing and branding.  Mr. Wallace purports to opine on intellectual property and product design, areas in which he has no credentials and no authority.  Therefore, in addition to being inadmissible as unhelpful and unreliable, Mr. Wallace's opinion should be excluded because he is unqualified.

Mr. Wallace's own synopsis of his qualifications offers no evidence of any experience in intellectual property or product design.  *See* Wallace Report at 3-4.  The closest he comes is his "direct expertise in the development of brand messaging and package design for the storage bag category"—but "package design" is not at issue here.  Indeed, Dr. Seggev intentionally did not even show packaging in his consumer survey because the study was intended to gauge "the perceived similarity of the products themselves," and not the "likelihood of confusion under market conditions."  Seggev Report ¶ 39.  Experience in brand message and package design does not qualify

Mr. Wallace to opine on the similarity of product design or alleged misappropriation of intellectual property.

Rule 702 "requires an expert's testimony to have 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Stuller v. United States*, 811 F.3d 890, 896 (7th Cir. 2016) (quoting *Kumho Tire Co.*, 526 U.S. at 149). Mr. Wallace is not "qualified as an expert by knowledge, skill, experience, training, or education" to opine on issues of intellectual property and product design, for the simple reason that he has presented no basis for concluding that he has such qualifications. The glaring lack of support for his opinions only confirms the inadequacy of his qualifications.

## Conclusion

For the reasons set forth above, Minigrip respectfully requests that the Court exclude the testimony of Dr. Seggev and Mr. Wallace as unhelpful and unreliable under Rule 702 and *Daubert*.

Dated:  February 13, 2017                Respectfully submitted,

*s/ Jennifer L. Gregor*
Jennifer L. Gregor
Mark W. Hancock
Adam R. Prinsen
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone:  608-257-3911
Fax:       608-257-0609
Email:  jgregor@gklaw.com
             mhancock@gklaw.com

Nicholas A. Kees
GODFREY & KAHN, S.C.
833 E. Michigan Street, Suite 1800
Milwaukee, WI 53202
Phone:  414-273-3500
Fax:       414-273-5198
Email:   nkees@gklaw.com

Attorneys for Defendant Minigrip, LLC

16764832.2