UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

S.C. JOHNSON & SON, INC.,

                  Plaintiff,

           v.

MINIGRIP, LLC,

                  Defendant.

Case No. 3:16-cv-00244

**DECLARATION OF ELI SEGGEV, PH.D. IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY**

I, Eli Seggev, Ph.D. declare as follows:

1.     I have been retained by counsel for Plaintiff S.C. Johnson & Son, Inc. ("SCJ") in this matter, and previously provided an expert report titled "A Study of Consumer Perceptions of Similarity Among Seven Plastic Food Bags" (hereafter, the "Consumer Study").

2.     In connection with this declaration, I have reviewed the defendant Minigrip LLC's ("Minigrip") Motion to Exclude Expert Testimony (the "Motion"), the Memorandum of Law in Support of Minigrip LLC's Motion for Summary Judgment, the Expert Report of Jonathan D. Hibbard, a letter dated February 1, 2016 from Paul J. Hart on behalf of Minigrip (SCJ0007625), and a spreadsheet containing data that I understand to be Nielsen sales data (SCJ0031654).

3.     In the Motion (at page 14), Minigrip states that "consumers who perceived the Meijer bag to be dissimilar to the Project Lincoln bag could still have chosen it as the 'most similar' among the options at hand." From a researcher's point of view this is an incoherent logical fallacy. If a consumer perceives a bag labeled by a letter to mask its true identity in a set of pictures of six different bags similarly masked to be "most similar" to a bag also identified by

35823624

a letter, how can that person belong to two logical sets at the same time: the set of people who find a bag "most similar" to the comparator bag and a set of people who do not find the bag "most similar"? It makes no sense. Furthermore, the question provided a "None of the above" answer category. If some respondents found all the bags to be dissimilar, the Meijer bag included, they had the option to state their view as "none of the above." And if some respondents found any bag other than the Meijer bag to be most similar to the SCJ Project Lincoln bag, they had that option too—choosing one of the other bags.

4.      This illogical argument apparently derives from Dr. Hibbard's assertions in paragraphs 21 and 22 of his report, which are (a) flatly contradicted by Minigrip's own arguments in support of its motion for summary judgment; (b) contain similar flawed logic and (c) rely on inapplicable literature.

5.      First, Dr. Hibbard appears to contend that re-closable food storage plastic bags being sold in the market place are so different from one another as to be analogous to the differences in appearance among apples, bananas, coconuts, and oranges. Believing this to be the case, he argues that asking consumers to identify the food storage plastic bag on the market that is "most similar" to the SCJ Project Lincoln Bags is akin to asking which fruit is "most similar" to apples. This may be an interesting academic discussion but is totally irrelevant here and belied by Minigrip's statement in its memorandum of law in support of its motion for summary judgment:

> The vast majority of features of re-closable plastic bags—size, length of lips, grip strips on the lips, color in zippers, sound and feel of zippers, etc.—have been common throughout the industry for years and, in some cases, decades.

6.      The Consumer Study's structure asking consumers to identify the "most similar" bag on the market compared to the SCJ Project Lincoln Bag simply acknowledges the reality of

the situation urged by Minigrip in its motion for summary judgment by asking consumers to identify the most similar food storage bag or to select none of the above if, for whatever reason, they could not conclude one is most similar.

7.      Similarly, the February 1, 2016 letter from Minigrip to SCJ asserting that it had not breached the contracts at issue in this case states:



8.      The Consumer Study's structure asking consumers to identify the "most similar" bag on the market compared to the SCJ Project Lincoln Bag simply tests the theory posited by Minigrip prior to the litigation and establishes that consumers do view the Minigrip/Meijer Bags as being the most similar among all of the other plastic storage bags tested, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

9.      Dr. Hibbard's challenge to the measurement methodology is also flawed because he asserts that a consumer study should have measured "perceptions of plain similarity" or should have measured against a "hypothetical threshold for 'meaningfully similar" to the SCJ Project Lincoln Bag.  Such a hypothetical threshold only exists in the researcher's (Dr. Hibbard's) mind, and is improper.

10.     The measurement of consumer perceptions, attitudes, beliefs, motivations, etc., is a two-step process: (1) specifying or applying a yardstick—in this case choosing "most similar"

with regard to the appearance of one of the six bags presented to consumers as an answer category; and (2) calculating the proportion of people in the relevant universe who made that choice. Dr. Hibbard's assessment relies on the absence of any objective yardstick, and would only measure against a subjective standard of "plain similarity" or "hypothetical threshold for 'meaningful similarity,'" that, if invoked at all, should be accompanied by an objective validity confirmation. Otherwise, they simply represent a polemic devoid of any factual basis.

11. Regardless of how one chooses to respond to the research proffered in this case, one fact is indisputable: between 42.3 and 48.5 percent of respondents in the three product categories selected the Meijer bag as "most similar." Those proportions are statistically significantly different from any of the remaining five choices available to respondents.

12. In paragraph 21 of his Declaration, Dr. Hibbard offers a lengthy lecture on the four types of scales used in opinion research (footnote 1) in support of his contention in paragraph 22 that the "most similar" measurement used in the Consumer Study is, in his words, "folly." The only correct observation relating to his comment is that "all students of marketing research are taught the fundamentals of measurement theory." The rest is patently wrong as his own statements in the above mentioned footnote contradicts his own assertion. In that footnote, Dr. Hibbard states that: "Ordinal measures contain information about whether an object possesses more or less of a characteristic than other objects." That observation is correct and the study I conducted was undertaken precisely for the purpose of testing whether the Meijer plastic bag possesses more or less of the characteristic of similarity of appearance relative to other bags used as controls.

13. In the Motion and in reliance on Dr. Hibbard's report, the defendant improperly asserts that the "None of the above" answers to the similarity measurement are "astonishingly

high." These assertions violate the common rule used by professional researchers in evaluating the work of their peers because it is untethered from any facts or data. In presenting or evaluating survey research results one must refrain from making personal assertions regardless of the years of experience one has. Scientific papers are bound by the data collected for the occasion and do not leave any room for opinions, explanatory but yet untested hypotheses, or off-the-cuff remarks. The reason for that rule is simple: If "A" offers an opinion, it opens the door to "B" offering a counter-opinion and pretty soon nobody remembers the facts but, instead, are focusing on whose voice is stronger. In the research profession it is best to stick to the facts and accept them as such. Consequently, in the research profession, the **only basis** to make such an assertion is to conduct another study that "corrects" for the alleged errors. Only then can one make judgments about whether the "None of the Above" response in this study was low, high, or "astonishingly high."

14. In paragraph 23 of his submission, Dr. Hibbard criticizes the Consumer Study for failing to include a "Don't know" answer to the question asking respondents to pick the most similar bag in appearance to the Lincoln Project bag. "Don't know" options apply in some cases but not in others. In this particular case, where respondents were tasked with making a choice, the answer "none of the above" is the correct approach to providing an opportunity for not making a decision, if, indeed, one could not. The answer "don't know" would not make logical sense here where there is not a choice between knowing or not knowing something. If one took Dr. Hibbard's approach, one would present respondents with an untenable situation. No matter what else it does, survey research must present respondents with logical options rather than abstract rules taught by some in university settings.

15.     I also note that it is an accepted practice in the survey industry to not include a "Don't Know" or "No Opinion" option.  *See also Reference Manual on Scientific Evidence* at 389-391, Federal Judicial Center (3d Ed. 2011).  In particular, because this survey involved a product that is common and simply asked respondents to judge the appearance of a common product used in ordinary daily lives it would have been consistent with the range of acceptable survey practices to not include a "None of the Above" or "I don't know" option.  *See also id.* at 390 (failing to include a "no opinion" option may inject some "imprecision" in connection "with the proportion of respondents who are unfamiliar with the topic at issue.").

16.     The Federal Judicial Center's reference manual (at 391) states:

> Recent research on the effects of including a "don't know" option shows that quasi-filters as well as full filters may discourage a respondent who would be able to provide a meaningful answer from expressing it.  The "don't know" option provides a cue that it is acceptable to avoid the work of trying to provide a more substantive response. Respondents are particularly likely to be attracted to a "don't know" option when the question is difficult to understand or the respondent is not strongly motivated to carefully report an opinion.  One solution that some survey researchers use is to provide respondents with a general instruction not to guess at the beginning of an interview, rather than supplying a "don't know" or "no opinion" option as part of the options attached to each question.  Another approach is to eliminate the "don't know" option and to add follow-up questions that measure the strength of the respondent's opinion.

17.     The Motion falsely states that respondents were never instructed not to guess.  In fact, they were given such an instruction at the outset of the study as set forth in my report.

18.     Thus, far from being biased in favor of SCJ, by including an instruction not to guess, and including open-ended follow-up questions—in addition to offering the "None of the Above" option—the Consumer Survey's structure was even-handed and, indeed the structure of the survey erred on the side of not inflating the number of respondents that selected any competing bag much less the Meijer Bag specifically.

19.    As with the false statement that the Consumer Study failed to instruct respondents not to guess (it did), the Motion also falsely asserts that the Consumer Study failed to ask "respondents to state their gender, age, and home zip code." (Motion at 15.)  In fact, the gender, age, and state of residence were collected as part of the survey and I understand this information has been produced in the litigation for Dr. Hibbard's consideration.

20.    The Motion (and Dr. Hibbard) also complains that respondents could have rushed through the survey, noting it took some of them 90 seconds or less.  However, the survey was intentionally designed to take 90-120 seconds.  There are two reasons for this.  The survey structure was relatively simple and straightforward, asking consumers to answer one key question about the appearance of a product that was familiar to them.  Second, good researchers recognize that a short, concise survey that limits the length of the interview encourages respondents to complete the task rather than abandon it in the middle.

21.    The Motion further asserts that the data was not cleaned.  But neither the Motion nor Dr. Hibbard makes any assertion that the purported failure to "clean" the data affected the results of the Consumer Study in any way.  By this failure, I infer that Dr. Hibbard concluded that the results of the survey would not have changed had additional steps been taken to eliminate some of the answers to the open-ended question asking for reasons for rating the six bags in respect to similarity of appearance to the Project Lincoln bag that do not use recognizable or complete English words or sentences.

22.    There is no requirement that surveys provide open-ended questions to solicit reasons for respondents' answers to a previous question. I have seen and done many methodologically sound surveys that have no open-ended questions. When open-ended questions are provided, some respondents almost always provide illegible words or answers to the

questions. This does not necessarily mean that the respondent's answers to the other questions should automatically be disregarded, and does not mean that the data is "dirty." At this point the researcher has to choose whether to eliminate the respondent entirely from the survey population. This is a judgment call based on a number of factors, including overall sample size, distribution across respondents, etc. Here, I decided that it was unnecessary to eliminate them since the decision to eliminate or not to eliminate them did not affect the quantitative results of the survey.

23. Finally, the Motion contends that the Consumer Study sample of respondents is weighted too much toward the female gender. Again, neither the Motion nor Dr. Hibbard can explain how this would have affected the results of the Study in any way. Dr. Hibbard's contention is based on a report published by The Hartman Group in 2014 (http://www.hartman-group.com/hartbeat/581/habits-of-the-male-shopper), which shows that 43 percent of males interviewed describe themselves as "primary grocery shoppers." Unfortunately, that statistic has nothing to do with who buys food plastic bags. This is a blatant example of misreading or misinterpreting data for polemical purposes, which I do not believe serves the interests of the finder of fact in the context of litigation.

24. I selected the 80% female sample based on my review of publicly-available grocery shopping data and discussions with counsel ████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████

25. After reviewing the Motion and the Expert Report of Mr. Hibbard, it continues to be my opinion that the methodology employed in connection with the Consumer Study was

sound and appropriate. I hold that opinion to a reasonable degree of certainty within my field of expertise.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 10th day of March, 2017.

*s/ Eli Seggev*
Eli Seggev, Ph.D.