IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

S.C. JOHNSON & SON, INC.,

                                    Plaintiff,                          OPINION & ORDER

    v.
                                                                        16-cv-244-jdp
MINIGRIP, LLC,

                                    Defendant.

---

Plaintiff S.C. Johnson & Son, Inc. (SCJ), owns the Ziploc brand of reclosable plastic bags. SCJ brings this breach of contract case against defendant Minigrip, LLC, which manufactures Ziploc bags for SCJ. SCJ contends that Minigrip breached its agreement with SCJ by making bags for the Meijer grocery chain that are "similar" to SCJ's Ziploc bags, and by using SCJ's confidential information to make the Meijer bags.

Minigrip moves for summary judgment. Dkt. 44. The material facts are undisputed, and SCJ's first claim turns on the interpretation of the term "similar." The Meijer bags are not similar to the Ziploc bags under any reasonable interpretation of the term. As for the second claim, SCJ adduces no evidence that Minigrip used SCJ's confidential information in making the bags. The court will grant Minigrip's motion for summary judgment and deny all other pending motions.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

The market for reclosable plastic bags includes national brands, such as Ziploc, Hefty, and Glad, and store brands that compete with the national brands. SCJ owns the Ziploc brand;

Minigrip is a manufacturer of reclosable plastic bags. Minigrip makes Ziploc bags for SCJ, and it makes store brand bags for others. This dispute arises from an agreement between SCJ and Minigrip concerning Project Lincoln, which was SCJ's code name for the development of the latest iteration of the Ziploc bag.

## A. Project Lincoln agreements

The parties executed several agreements in connection with Project Lincoln, but this case concerns only two: the Project Lincoln Confidential Disclosure and License Agreement, Dkt. 48-8 (License Agreement) and the Contract Manufacturing Agreement, Dkt. 48-16 (Manufacturing Agreement). Both agreements were drafted by SCJ, and they are governed by Wisconsin law.

Both agreements contain an exclusive dealing provision and a confidentiality provision. Neither agreement prohibits Minigrip from making reclosable bags for other parties, but the exclusive dealing provision prohibits Minigrip from making the Project Lincoln bags, or any bags similar to the Project Lincoln bags for anyone else. And both agreements prohibit Minigrip from using SCJ's confidential information for anything other than making Project Lincoln bags. The pertinent provisions in the License Agreement provide that Minigrip:

> shall not, either before or after termination of the [License] Agreement: (i) manufacture the Project Lincoln Products or a similar product for, or sell the Project Lincoln Products or a similar product to, anyone other than Johnson; (ii) use any of Johnson's Intellectual Property or Confidential Information, . . . except for the purposes of manufacturing the Project Lincoln Products for Johnson . . . .

Dkt. 48-8, § 4.c. Similarly, the Manufacturing Agreement provides:

> **Exclusivity** During the Term and for a period of two (2) years after termination of this Agreement, [Minigrip] shall not manufacture or sell the Product or a similar product for or to anyone other than Johnson.

. . .

> **Confidentiality Obligation**. [Minigrip] shall not disclose any Confidential Information to any third party or use or reproduce any Confidential Information for any purpose other than to carry out its obligations under the Agreement.

Dkt. 48-16, at 6, §§ 5.4, 13.2.

Neither agreement defines the term "similar" or specifies the characteristics of a "similar product."

## B. Project Lincoln bags and Meijer bags

SCJ brought this case when it learned that Minigrip was manufacturing store-brand reclosable bags for the Meijer chain of grocery stores. The Meijer bags were designed by Bill Sweaney, an employee of Minigrip's parent company, Inteplast Group. *See* Dkt. 84, ¶¶ 49-50.

Specimens of both the Project Lincoln bags and the Meijer bags have been provided to the court, so there is no factual dispute about the features of the bags. The parties dispute whether the bags are "similar" as that term is used in the agreements. The bags are, of course, similar in the ways in which all reclosable plastic bags are similar, but there are also numerous visible differences. The differences include, among other things, number of zippers, zippers' colors, cross-hatching and dimples on lips, deformations on the zippers, grip strips, edges, and lip colors.

The parties focus on the last two features. The first involves the edges of the opening side of the bag. The Project Lincoln bags have a die-cut trapezoid-shaped tabs on one lip of the bags (like the tab on a file folder), which assists users to open the bags easily. SCJ calls these the Easy Open Tabs. The Meijer bags do not have die-cut tabs, but they have offset lips, meaning that on the opening side of the bag, one edge that protrudes further than the other. Dkt. 84, ¶ 63.

3

The second feature is the lip color. On the Project Lincoln bag, both lips are colored, with one side colored in the same hue but to a deeper intensity. Each Meijer bag has one colored lip and one clear, uncolored lip. The Project Lincoln bags and the Meijer bags compete with each other in Meijer stores.

## C. SCJ's confidential information

SCJ contends that Minigrip designed, and now manufactures, the Meijer bags using SCJ's confidential information. The confidential information identified by SCJ is: SCJ's consumer research that shows consumers' preference for full-colored lips; SCJ's two "Ziploc Innovation" documents; and SCJ's method know-how on applying color to lips evenly. (SCJ also claims that Minigrip used SCJ's equipment in violation of the confidentiality provisions. But, as explained below, SCJ did not raise this claim in its complaint, and so SCJ will not be allowed to pursue that claim.)

## D. Jurisdiction

The court has subject matter jurisdiction on the basis of diversity under 28 U.S.C. § 1332. SCJ is a Wisconsin corporation with its principal place of business in Wisconsin. Minigrip is a limited liability company. Minigrip's sole member is Inteplast, which is a limited partnership. Each of Inteplast's three partners, Amtopp Corporation, World-Pak Corporation, and Integrated Bagging System, Inc., is a Delaware corporation with a principal place of business in New Jersey. For the purposes of diversity, Minigrip is a citizen of Delaware and New Jersey. The parties are diverse; the amount in controversy exceeds $75,000.[1]

---

[1] The parties included arbitration clauses in both the License Agreement and the Manufacturing Agreement. Dkt. 48-8 § 12 and Dkt. 48-16, § 15.3. Those clauses require the parties to arbitrate their disputes when either party requests for arbitration. Neither side chose to arbitrate.

ANALYSIS

## A. Minigrip's summary judgment motion

A district court must grant summary judgment when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court must view the evidence in the light most favorable to the nonmoving party, but "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Minigrip moves for summary judgment on both of SCJ's contract claims: (1) that the Meijer bags are "similar" to the Project Lincoln bags; and (2) that Minigrip used SCJ's confidential information in making the Meijer bags. Wisconsin law applies to both claims because the parties chose Wisconsin law as the governing law for both the License Agreement and the Manufacturing Agreement. To prevail on a breach-of-contract claim under Wisconsin law, a plaintiff must establish three elements: the existence of a valid contract; a breach; and damages. *Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 714 N.W.2d 582.

### 1. Exclusivity provisions

Both agreements prohibit Minigrip from making products that are "similar" to the Project Lincoln bags. Because the bags at issue are before the court, this is essentially a question of contract interpretation.

The overall objective of contract interpretation is to derive the parties' intention. *Wilson Mut. Ins. Co. v. Falk*, 2014 WI 136, ¶ 23, 360 Wis. 2d 67, 857 N.W.2d 156. The process begins

with the text of the contract. *MS Real Estate Holdings, LLC v. Donald P. Fox Family Tr.*, 2015 WI 49, ¶ 37, 362 Wis. 2d 258, 864 N.W.2d 83. If the text is unambiguous, then the court adopts its plain meaning and goes no further. *Id*. If the text is ambiguous, the court may consider extrinsic evidence to ascertain the parties' intent. *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶ 36, 363 Wis. 2d 699, 866 N.W.2d 679. In ascertaining the parties' intent, the court must "reject a construction that renders an unfair or unreasonable result." *MS Real Estate Holdings*, 2015 WI 49, ¶ 38 (quoting *Tempelis v. Aetna Cas. & Sur. Co.*, 169 Wis.2d 1, 9, 485 N.W.2d 217 (1992)). And the court must afford contract terms "'common sense' and 'realistic' meaning." *Id*. (quoting *Betz v. Diamond Jim's Auto Sales*, 2014 WI 66, ¶ 68, 355 Wis.2d 301, 849 N.W.2d 292).

SCJ contends that the Meijer bags are "similar" to the Project Lincoln bags under four theories of what that term means: (1) they "directly compete" with each other; (2) they share certain physical attributes; (3) consumers could find them similar; and (4) Minigrip admitted that the bags were similar. Each of these theories fails as a matter of law for reasons explained below.

### a. "Similar" as "directly competitive"

SCJ contends that prohibition on making "similar products" means that Minigrip agreed that it would not make reclosable bags that "compete directly (head-to-head) with" the Project Lincoln bags. Dkt. 70, at 17. This theory fails for three reasons.

First, SCJ's interpretation contradicts other express provisions in the parties' contracts. The License Agreement acknowledges that Minigrip is free to make and sell competing products to third parties. The License Agreement Section 9 states, "[e]ither party is free to deal in *any way* with third parties provided that there is no use or disclosure of Confidential Information."

Dkt. 48-8, § 9 (emphasis added). If Minigrip cannot make products that directly compete with the Project Lincoln bags, then Minigrip is not free to deal in any way with third parties. SCJ's interpretation is also inconsistent with the Manufacturing Agreement. Section 3.2(f) provides that Minigrip must give SCJ the most favored status by giving SCJ the same or better prices than those offered to third parties for the same or similar articles:

> **Most Favored Status**. Supplier represents and warrants to Johnson that the Product prices and other terms and conditions of this Agreement are not less favorable than those currently extended by Supplier to any other person for the *same or similar articles* supplied in similar quantities. Except to the extent prohibited by applicable law, Supplier shall immediately reduce the price to Johnson for the affected Product if Supplier reduces its price or extends a lower price to other persons for the *same or similar article* for the supply of similar quantities and provide such other terms and conditions if Supplier extends such other terms and conditions to other persons.

Dkt. 48-16, § 3.2(f) (emphasis added). The most-favored status provisions in Section 3.2(f) clearly contemplate that Minigrip might sell similar articles to third parties. The License Agreement Section 9 and the Manufacturing Agreement Section 3.2(f) would be meaningless if Minigrip were unable to sell competing products to third parties.

The second reason this theory fails is that SCJ's extrinsic evidence does not support it. SCJ relies on three pieces of extrinsic evidence: (1) SCJ invested millions of dollars in differentiating the Project Lincoln bags from other reclosable bags; (2) SCJ "protected" its investment in the Project Lincoln bags by various means so that SCJ would "have a leg up on" its competitors; and (3) a SCJ employee told Minigrip employees during a meeting that Minigrip could not make competing products if Minigrip wished to be SCJ's strategic partner. Dkt. 70, at 22, 26-30. SCJ's evidence suggests why SCJ would not want competition from Minigrip or anyone else, but it does not show that the parties agreed that Minigrip would not

7

compete with the Project Lincoln bags. Extrinsic evidence can clarify contracting parties' intent, but only if it shows "some interpretative conduct by *both* parties." *Metro. Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 26, 291 Wis. 2d 393, 717 N.W.2d 58 (emphasis in the original); *see also Nodolf v. Nelson*, 103 Wis. 2d 656, 659, 309 N.W.2d 397 (Ct. App. 1981) ("Unilateral action by one party, however, is usually insufficient to remove uncertainty."). Because the extrinsic evidence shows only SCJ's unilateral actions, it is not evidence of the parties' intent.

The third reason this theory fails is that it is commercially unreasonable, given that Minigrip's entire business depends on manufacturing reclosable plastic bags. SCJ's reclosable bags compete with all store-brand bags, in one way or another, because they serve the same purpose and are sold in the same outlet to the same consumers. *See, e.g.*, Dkt. 85, ¶¶ 4-7, 16, 19-21; Dkt. 65-55, at 2-3. Indeed, SCJ developed the Project Lincoln bags to combat competition from store-brand bags. *See* Dkt. 69, ¶¶ 19-21. Adopting SCJ's interpretation would be tantamount to claiming that Minigrip could not make reclosable bags for any other party, which would effectively put Minigrip out of business. The agreement simply did not contemplate that extreme level of exclusivity.

SCJ apparently concedes that Minigrip is entitled to make bags that compete with the Project Lincoln bags, but SCJ contends that Minigrip cannot make bags that compete "directly." SCJ suggests that a directly competitive bag is one that is deemed to be a "national brand equivalent," abbreviated NBE. *See* Dkt. 70, at 18. Sellers of store-brand products sometimes engage third-party laboratories to test store-brand products to verify that they match the national brands in certain aspects to facilitate consumer acceptance of the store brand as the equivalent of the national brand. In this case, Meijer required Minigrip to submit

the Meijer bags to NBE testing. As a result of NBE testing, the thickness of the bag film was increased so that it would be on par with the Project Lincoln bags.

There are several problems with SCJ's notion that "similar" means NBE. First, SCJ refers to NBE in passing in a single paragraph, without developing the argument, so the court need not consider it. Dkt. 70, at 12. Second, there is nothing in the parties' agreements, or in the extrinsic evidence, that suggests that SCJ and Minigrip understood that "similarity" meant national brand equivalency. Third, national brand equivalency is a loose concept that is not meaningfully tied to the features of the Project Lincoln bags. In this case, the unique features of the Project Lincoln bags involve the Easy Open Tab and the color differentiation on the lips, but there is no evidence that these features were part of the NBE testing conducted on the Meijer bags. There is also no requirement that a store brand must undertake third-party NBE testing at all, so if a bag that is not deemed to be NBE could, in fact be much more similar to a national brand than one that is. Fourth, SCJ falls short of demonstrating that the Meijer bags are actually the NBE versions of the Project Lincoln bags. SCJ does not point to an NBE testing result showing that the current Meijer bags obtained the NBE status, and SCJ's expert who reviewed the NBE testing results does not reach the conclusion that the Meijer bags are the NBE versions of the Project Lincoln bags. *See* Dkt. 16.

There is no doubt that Meijer wanted a reclosable bag that would compete with Ziploc, and keep up with the new Project Lincoln bags. But there is nothing in the parties' agreements that prevented Minigrip from making such bags for Meijer, even if the Meier bags had been tested by a third-party for national brand equivalency. It would have been easy for the parties, particularly for SCJ as the drafting party to articulate what type of competition was prohibited. But the court will not "insert what has been omitted or rewrite [contracts] made by the parties."

*Columbia Propane, L.P. v. Wis. Gas Co.*, 2003 WI 38, ¶ 12, 261 Wis. 2d 70, 661 N.W.2d 776

(quoting *Levy v. Levy*, 130 Wis. 2d 523, 533, 388 N.W.2d 170 (1986)). In sum, neither the

License Agreement nor the Manufacturing Agreement prohibits Minigrip from making

products that compete, even directly, with the Project Lincoln bags.

>    **b. Physical similarity**

SCJ also contends that the Meijer bags and the Project Lincoln bags are similar because

they share certain physical attributes identified by SCJ. These physical attributes are not

specified in the License Agreement or the Manufacturing Agreement; they are set out in a

document called the Project Lincoln Know-How Book, which SCJ contends is incorporated by

reference in the License Agreement. According to SCJ, the material physical characteristics of

a Project Lincoln bag are "(1) colored lips, (2) a die-cut tab, and (3) lips with a color

differential." Dkt. 70, at 17. "Color differential" is further defined, according to SCJ, as having

either (1) the same color on both lips, (2) different colors on lips, (3) one colored lip and the

other with no color, or (4) different color intensity on lips. *Id.* at 18. SCJ argues that the Meijer

bags are similar because they have these specified features. SCJ's argument fails for two reasons.

The first problem is that the Project Lincoln Know-How Book is not actually

incorporated by reference into the License Agreement, at least not in the sense that SCJ

suggests. The License Agreement refers to the Project Lincoln Know-How Book, but only in

the paragraph defining "Confidential Information." That paragraph states, in pertinent part:

> Confidential Information shall include, but not limited to, the
> method of implementing Project Lincoln as described in, but not
> limited to, the know-how book titled "SC Johnson Confidential
> Project Lincoln Know-How Book" copy number 3 to be provided
> to [Minigrip] upon signing this Agreement.

Dkt. 48-8, at 2. The License Agreement does not state that the meaning of the term "similar" is somehow tied to the description of the Project Lincoln bags in the Know-How Book. The Manufacturing Agreement defines the specifications of Project Lincoln bags without referring to the Know-How Book. Dkt. 48-16, § 4. Thus, the notion that the definition of "similar" in the parties' agreements should be derived from the Know-How Book lacks textual support.

The second problem is that SCJ misreads the description of the Project Lincoln bags in the Know-How Book. SCJ says the Know-How Book describes the Project Lincoln bags as having three features: "(1) colored lips, (2) a die-cut tab, and (3) lips with a color differential." But actually, the Know-How Book describes the bags much more specifically:

> The Bag features
>
> • Colored lips—the lips of the bag are colored
> • Cut lips—the lips are cut to make them easier to grasp and open.
> • Cutting the lips allow for lower bag weight
> • The short lip—is a darker color than the longer cut lip

Dkt. 41-10, at 4. The Know-How Book describes the Project Lincoln bags as having colors on *both* lips, with the shorter lip being darker than the longer lip. Each Meijer bag has one colored lip and one uncolored lip.

A few pages later, under the heading "Method of manufacturing," the Know-How Book explains what SCJ's equipment, called color extruders, can do. The Know-How Book states the machines could manufacture lips with the same color; different colors; one lip colored and the other no color; or different color intensity in the lips. *Id*. at 7. The natural reading of these variations is that the Know-How Book is describing the capacity of the color extruders, not the specific features of the Project Lincoln bags, or the meaning of "similar product" as agreed upon by the parties.

The bottom line is that the parties' agreements do not specify the features of a bag similar to a Project Lincoln bag, and the Know-How Book does not specify those features either. And even if the court were to consider the Know-How Book as a definition of the features of the Project Lincoln bag itself, it would have to conclude that the Meijer bag does not have those features: it has no die-cut tab, and it does not have two colored lips.

### c. Consumer perception of similarity

SCJ's third theory of similarity is that consumers perceive the Meijer bags as similar to the Project Lincoln bags. For this theory, SCJ relies on the report of its expert, Eli Seggev, who conducted a survey to assess consumers' perceptions of the similarity between the Meijer bags and the Project Lincoln bags. Dkt. 39.

One problem with Seggev survey is that it fails to establish that a majority of consumers perceive the Meijer bags to be similar to the Project Lincoln bags. Seggev conducted an online survey with about 600 respondents. He showed them a picture of a Project Lincoln sandwich bag, and then asked which of five other reclosable sandwich bags was "most similar" to the Project Lincoln bag in appearance. Dkt. 39, at 12. He posed the same inquiry for storage and freezer bags. None of the bags were identified by brand.

A large proportion of respondents (35.5 to 41.3 percent) chose the "[n]one of the above" option, meaning that many respondents did not think that any of other bags, including the Meijer bags, were similar to the Project Lincoln bags. Some (16 to 20.9 percent) thought that bags other than the Meijer bags were most similar to the Project Lincoln bags. The remainder of the respondents (42.3 to 48.5 percent) chose the Meijer bags as most similar to the Project Lincoln bags. So less than half of the respondents thought that the Meijer bags were most similar to the Project Lincoln bags in appearance. SCJ spins Seggev's report in various

ways, but SCJ does not explain how general consumers perceive the Meijer bags as similar to the Project Lincoln bags when only less than half of the respondents agree with SCJ.

But the more fundamental problem with the Seggev survey is that it is irrelevant to the question at hand, which is: what did the *parties* intend by the term "similar" in their agreements? The court must interpret contract terms to "ascertain the true intentions of the parties." *Town Bank v. City Real Estate Dev*., LLC, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 793 N.W.2d 476. And "a contract is to be interpreted in the manner that it would be understood by persons in the business to which the contract relates." *Columbia Propane*, 2003 WI 38, ¶ 12. The parties did not express any intent to define the term to mean whatever consumers perceived to be similar.

### d. Minigrip's purported admissions of similarity

SCJ's fourth theory of similarity is that Minigrip has admitted that the Meijer bags are similar to the Project Lincoln bags. For this theory, SCJ relies on the Meijer bags' packaging and statements from Minigrip employees, which, according to SCJ, show that Minigrip intentionally made the Meijer bags similar to the Project Lincoln bags. There is no doubt that the Meijer bags are similar, in some sense, to the Project Lincoln bags. But these purported admissions also do not show what the parties meant by "similar" as that concept was used in their agreements, and thus the purported admissions is not evidence that Meijer breached those agreements.

The Meijer bags' packaging says "Compare to Ziploc® bags." The packaging artwork was prepared by Meijer. Dkt. 85, ¶ 164. And the artwork refers to Ziploc bags generally, without expressly referring to the new Project Lincoln bags. *See*, *e.g.*, Dkt. 41-37, at 2. There is no dispute that Meijer wanted its bags to compete with the Project Lincoln bags, which the

"Compare to Ziploc® bags" confirms. But for reasons already explained, the fact that the bags are competitive does not make them similar as that concept is used in the parties' agreements. The packaging could show, at most, *Meijer's* conception of similarity, not what the parties meant. So the "Compare to Ziploc® bags" statement is evidence of competition, not evidence of the parties' intent, and it is not an admission that the bags are similar in a way that would breach the parties' agreements.

SCJ contends that Minigrip employees Bob Pondo and Fernando Valez referred to the Meijer bags as ones "matching" the Project Lincoln bags. SCJ relies on Pondo's and Valdez's deposition testimony, Valdez sales report, and Valdez's performance review. Pondo testified that he met with someone from Meijer in March 2015 to introduce color-coded bags that would match the Project Lincoln bags. Valdez's sales report shows the same. Valdez testified that the Meijer bags were Minigrip's attempt to provide a national brand equivalent bag. Valdez's performance review shows that he was "working on matching the Ziploc bags and counts by implementing the new 'Colored Tab' food bags that [would] be launched in 2015." Dkt. 65-25, at 2. SCJ contends that an employee at Minigrip's Thailand manufacturing facility, Jan Patvibul once described the Meijer bags as "similar" to the Project Lincoln bags. But once again, this evidence shows that Meijer, and by extension Minigrip, intended to compete with the Project Lincoln bags. And in that sense, the Meijer bags are necessarily somewhat similar to the Project Lincoln bags. But none of these purported admissions establish that any of the features of the Meijer bags were ones that Minigrip had agreed not to use.

SCJ submitted an amendment to its proposed findings of fact after the parties finished briefing. Dkt. 153. SCJ contends that Garth Bielke, a general manager of operations at Minigrip, instructed Patvibul in Thailand not to allow SCJ personnel to see the Meijer bags.

SCJ argues that this is an admission by Minigrip that the Meijer bags and the Lincoln bags are similar. But a manufacturer may have many legitimate reasons not to show a customer a product that belonged to another customer. (Indeed, that is what Minigrip agreed not to do with SCJ with respect to the Project Lincoln bags.) Thus, even if the court were to consider this proposed fact, it falls short of establishing that the bags are similar.

### e. Meaning of "Similar"

So what then, did the parties mean by a "similar product"?

Minigrip contends that the term "similar product" is impossible to interpret and that the court should conclude that the term is indefinite and deem those provisions to be unenforceable. This argument has some appeal: the term "similar product" is not defined in the parties' agreements and the parties' complicated relationship makes it hard to determine what they intended. But concluding that the provisions are indefinite and unenforceable is a last resort. "When there is evidence that two parties intended to enter into a contract, "the [court or] trier of fact should not frustrate their intentions, but rather should attach a 'sufficiently definite meaning' to the contract language *if possible*." *Vohs v. Donovan*, 2009 WI App 181, ¶ 8, 322 Wis. 2d 721, 727, 777 N.W.2d 915, 917 (quoting *Metro. Ventures*, 291 Wis.2d 393, ¶ 25) (emphasis in the original). Minigrip proposed a reasonable definition in its opening brief.

SCJ's primary innovation in Project Lincoln was the die-cut tab. *See, e.g.*, Dkt. 84, ¶ 102 and Dkt. 85, ¶ 31. Color had been used on the lips of reclosable bags in various configurations before, but the particular method of color differential is unique to the Project Lincoln bags. The Project Lincoln method consists of coloring both lips with the same hue, but making one lip less saturated than the other. Dkt. 85, ¶ 33. Accordingly, the court will construe a "similar

product" to be a reclosable plastic bag that has either a die-cut tab or colored lips with one color having a less saturated color than the other. Under this construction of "similar product," there is no genuine dispute that Minigrip did not breach the exclusivity provision of either the License Agreement or the Manufacturing Agreement.

The court will grant summary judgment to Minigrip on SCJ's "similar product" claim.

### 2. Confidentiality provisions

Both the License Agreement and the Manufacturing Agreement prohibit Minigrip from using SCJ's confidential information that pertains to Project Lincoln. SCJ contends that Minigrip breached these non-disclosure provisions by:

1. using SCJ's research showing that consumers prefer full-colored lips on reclosable plastic bags;

2. using Information contained in two "Ziploc Innovation" documents to make the Meijer Bags;

3. using SCJ's manufacturing know-how on how to apply color on lips; and

4. using SCJ's equipment, known as extruders, to apply color.

Dkt. 70, at 41-48. SCJ cannot establish a breach of the agreements under any of these theories.

As for the use of SCJ's consumer research that showed consumers' preference for full-colored lips, SCJ adduces no evidence that Minigrip used that research. According to SCJ, a factfinder could infer that Sweaney, the designer of the Meijer bags, used the consumer research because Sweaney decided to include full-colored lips on the Meijer bags after talking to Garth Belke, Minigrip's operations manager. Belke, in turn, had information from SCJ's consumer research. SCJ cites Sweaney's deposition testimony, but the transcript shows that Sweaney talked to Belke *after* designing the Meijer bags. Sweaney testified that he drew his design that included full-colored lips, sent the design to Belke, and then discussed the design with Belke.

*See* Dkt. 37 (Sweaney Dep. 26:13-16, 26:24-27:10, 35:7-37:17). Because the full-colored lips were already in the design before Sweaney and Belke discussed the design, the full-colored lips could not have originated from Sweaney's conversation with Belke. Nor does the deposition transcript show, as SCJ contends, that Belke talked Sweaney into including colored lips in the design. Belke told Sweaney that manufacturing the design would be easy; he did not provide any input on the design. *Id*. at 35:23-36:12, 37:22-25. Accordingly, SCJ has not adduced evidence to support its theory that Minigrip used SCJ's consumer research.

SCJ also contends that Sweaney designed the Meijer bags using two "Ziploc Innovation" documents, which are short PowerPoint presentations. Dkt. 65-20 and Dkt. 65-21. SCJ does not identify the information from these slides that was used by Sweaney. And SCJ does not establish that Minigrip received the slides under any confidentiality obligation. Those slides were first shared by a third party, Ahold, who sent them to Trinity Plastics, a subsidiary of Inteplast, who then sent them to Sweaney at Inteplast, Minigrip's parent company. SCJ has not shown how Sweaney's use of the information from Ahold, Trinity Plastics, or Inteplast, who are not parties to either the License Agreement or the Manufacturing Agreement, constitutes Minigrip's breach. And SCJ's argument on this point is undeveloped, Dkt. 70, at 44, so the court could deem it waived.

SCJ's third theory is that Minigrip used SCJ's manufacturing know-how to apply color evenly to the lips of the Meijer bags. SCJ points to the Project Lincoln Know How Book and the declaration of one of its managers, Leland Smith, who states that he "recall[s] diagramming" and explaining the method to Minigrip personnel. Dkt. 63, ¶ 11. Minigrip has a long history of bag manufacturing, including making bags with colored lips. And SCJ adduces no evidence that Minigrip actually used the method Smith described. SCJ argues that a

factfinder could infer that Minigrip used the method because (1) Minigrip manufactures the Project Lincoln bags and the Meijer bags at the same facility where Smith explained the method, and (2) the same employees who work on the Project Lincoln bags also work on the Meijer bags. Dkt. 70, at 46-47. These facts fall short of establishing that Minigrip used the technique. The court concludes that SCJ has not raised a genuine issue of fact as to whether Minigrip used SCJ's method of color application.

SCJ also contends that Minigrip used SCJ's equipment in violation of the Manufacturing Agreement Section 7.1(a) and the License Agreement Sections 4(c)(ii) and (iii). Dkt. 70, at 47. For reasons explained in the next section, the court will decline to consider SCJ's belated claim.

The court will grant summary judgment to Minigrip on SCJ's breach of confidentiality claim.

## B. Other pending motions

The parties have filed several other motions: Minigrip's motion to strike jury demand, Dkt. 42; SCJ's motion for a preliminary injunction, Dkt. 96; and both sides' motions in limine, Dkt. 43 and Dkt. 94. The court will separately address SCJ's motion in limine, Dkt. 94, but the other motions are denied as moot.

In its motion in limine, Dkt. 94, SCJ asks the court to construe its complaint to include its claim based on Minigrips use of SCJ's equipment or to allow it to add a new claim. SCJ's operative complaint does not include a claim based on the use of the SCJ equipment. Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain statement of the claim showing the pleader is entitled to relief." And a complaint need not identify legal theories. *See King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014). But a defendant still needs to know what he or

she is being sued for, and the complaint needs to allege at least enough facts to put the defendant on notice of the plaintiff's claims. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013); *see also Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 776 (7th Cir. 1994) ("[A] complaint 'must be presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is.'" (quoting *Wade v. Hopper*, 993 F.2d 1246, 1249 (7th Cir. 1993)); *Jennings v. Emry*, 910 F.2d 1434, 1436 (7th Cir. 1990) (noting that Rule 8 does not "give litigants license to plead by means of obfuscation").

SCJ's complaint alleges that Minigrip breached the Manufacturing Agreement and the License Agreement by making products that are similar to the Project Lincoln bags and by disclosing or using SCJ's confidential information. The complaint does not refer to any equipment, and no one reading the complaint would think that Minigrip was being sued because it had used SCJ's equipment. SCJ did not have to lay out its specific legal theories, but its complaint did not give Minigrip notice of a claim based on misuse of SCJ equipment. So, if SCJ is to pursue this claim, an amendment of pleading is required.

SCJ may not amend its complaint at this stage of the litigation. Under Rule 15(a)(2), the court should freely grant leave to amend when justice so requires. But the court need not grant leave "when there is undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, or when the amendment would be futile." *Bethany Pharm. Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 861 (7th Cir. 2001). The primary issue here is undue delay.

Undue delay "generally arises when a plaintiff seeks leave to amend deep into the litigation." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 687 (7th Cir. 2014). Passage of time alone, without more, does not cause undue delay, and some prejudice to the adversary is also required. *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004). Prejudice

can be shown by an amendment that would "substantially alter the course of trial or effectively deny [the opponent] the opportunity (and certainly the reason) to take discovery on" the new claim. *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 750 (7th Cir. 2015); *accord* James Wm. Moore, *Moore's Federal Practice* § 15.15 (3d ed. 2017) ("Prejudice is especially likely to exist if the amendment involves new theories of recovery or would require additional discovery.").

The deadline for amending the complaint without the court's leave was in August 2016. SCJ admits that it was aware of the equipment issue in December 2016. Dkt. 94, at 4. But SCJ moved to amend its complaint only while Minigrip's summary judgment was pending, after Minigrip pointed out the deficiencies in SCJ's complaint. This is undue delay. *See Bell v. Taylor*, 827 F.3d 699, 705-06 (7th Cir. 2016) (holding that the district court properly denied a motion for leave to amend when the plaintiff did not request permission to amend until nearly eight months after the deadline for amending pleadings and the proposed amendment affected the summary judgment schedule).

Minigrip would also be prejudiced if the court were to grant SCJ's motion to amend. "A trial court may deny leave to amend when the amendment would cause the opposing party to bear additional discovery costs litigating a new issue and the moving party does not offer to reimburse the nonmoving party for its expenses." *See Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 849 (7th Cir. 2002). This is particularly true when the proposed amendment would "substantially alter the course of trial." *CMFG Life Ins. Co.*, 799 F.3d at 750. SCJ's motion to amend left Minigrip only two months before the close of discovery and another month after that to prepare a defense for the upcoming trial. The court will not force Minigrip

to scramble based on SCJ's motion to amend that should have been filed months ago. SCJ's request to amend its complaint is denied.

Finally, SCJ's new claim is moot. SCJ concedes that it seeks only injunctive relief. Dkt. 57, at 1. Minigrip has voluntarily stopped using SCJ's equipment, which SCJ does not dispute. Injunctive relief related to the use of SCJ's equipment is unnecessary.

## ORDER

IT IS ORDERED that:

1. Defendant Minigrip, LLC's motion for summary judgment, Dkt. 44, is GRANTED.

2. All other motions are DENIED.

3. The clerk of court is directed to enter judgment in favor of defendant.

Entered August 15, 2017.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge